MOORE, J., delivered the opinion of the court, in which MERRITT, J., joined., and McKEAGUE, J., joined in part.
McKEAGUE, J. (pp. 309-18), delivered a separate opinion concurring in part and dissenting in part.
OPINION
KAREN NELSON MOORE, Circuit Judge.
Four racing stewards employed by the State of Michigan argue that their Democratic supervisors retaliated against them for voicing support for or being perceived as affiliated with the Republican candidate in the 2006 Michigan gubernatorial election. Although certain stewards openly endorsed this candidate in the workplace, others remained silent. Nonetheless, all allege that they were retaliated against on the basis of political speech and affiliation. These facts thus present us with an issue of first impression for our court: whether individuals claiming to have been retaliated against because of their political affiliation must show that they were actually affiliated with the political party or candidate at issue. We believe that they do not.
Plaintiffs-Appellants Jeff Dye, Tammie Erskine, Patrick Hall, and Eric Perttunen (collectively, “the stewards”) appeal the district court’s grant of summary judgment in favor of Defendants-Appellees former Racing Commissioner Christine White and former Deputy Racing Commissioner Gary Post (collectively, “the defendants”). For the reasons stated below, we reverse the district court with respect to Dye’s protected-speech and political-affiliation retaliation claims and part of the stewards’ political-affiliation retaliation claims. We affirm the remainder of the district court’s grant of summary judgment.
*293 I. BACKGROUND
The Office of the Racing Commissioner (“ORC”) is a state government agency that regulates the Michigan horse-racing industry. The ORC hires racing stewards as independent contractors to perform regulatory, judging, and enforcement functions in conjunction with the three types of horse races that occur in Michigan: Harness, Thoroughbred, and Quarter Horse.
The plaintiffs in this case were appointed as racing stewards in the 1980s and 1990s. Patrick Hall was appointed on March 17, 1980, and currently works as a state steward for the Michigan Gaming Board. Jeff Dye was appointed on April 22, 1988, and was promoted to Administrative Liaison Steward in 1998. Dye was demoted to State Steward on December 31, 2006, and was terminated in June 2009. Eric Perttunen was appointed on March 22, 1994, and remains employed as a racing steward for the Michigan Gaming Board. Tammie Erskine was appointed on September 20, 1999, and was terminated on June 6, 2009.
The claims brought by the stewards require an understanding of the political context in Michigan and within the ORC during the 2005-2007 period. In 2005, when the alleged speech began, Democrat Jennifer Granholm was the Governor of Michigan. In January 2005, Granholm appointed White to serve as Racing Commissioner, and White was confirmed in October 2005 after a confirmation hearing before the state Senate. In the fall of 2006, Granholm was successful in her bid for reelection against Republican candidate Dick DeVos. White remained Racing Commissioner until July 2009.
Prior to being confirmed, White served as interim Racing Commissioner and was present in the agency on a daily basis leading up to the confirmation hearings. In July 2006, White hired Gary Post as a contract management consultant. When his assignment was complete in September 2006, White appointed him to the Deputy Racing Commissioner position, which he began on October 11, 2006.
After White’s confirmation and Post’s appointment, the defendants began making administrative changes to the stewards’ job duties, timekeeping procedures, number of days worked, and travel reimbursements. In October or November of 2006, Post told Dye that White planned to eliminate the Administrative Liaison Steward position at the expiration of Dye’s contract on December 31, 2006. Dye continued working as a racing steward until both he and Erskine were terminated in June 2009. The stewards argue that these actions were taken in retaliation for their being perceived as affiliated with the Republican Party and having engaged in protected speech during the 2006 gubernatorial election and confirmation process.
The plaintiffs filed a civil action in the U.S. District Court for the Eastern District of Michigan alleging a § 1983 First Amendment retaliation claim against the ORC; White, individually and in her official capacity as Racing Commissioner; and Post, individually and in his official capacity as Deputy Commissioner. The parties stipulated to dismiss with prejudice the claims against the ORC and White in her official capacity, and the district court granted in part and denied in part a dismissal motion with respect to the declaratory and injunctive relief claims against Post in his official capacity.
The remaining defendants brought a motion for summary judgment before the district court, arguing that the stewards could not provide evidence to sustain their burden. The district court granted the motion and entered judgment for the defendants. Additionally, in the order grant *294 ing summary judgment, the district court dismissed all claims against Post in his official capacity as moot given that Post is no longer employed in any state capacity. Dye v. Office of Racing Comm’n, No. 09-13048, 2011 WL 2144485, at *1 (E.D.Mich. May 31, 2011).
II. PROTECTED FIRST AMENDMENT ACTIVITY
At issue in this appeal are claims of retaliation based on protected speech (“protected-speech retaliation”) and retaliation based on political affiliation (“political-affiliation retaliation”).[1] Protected-speech retaliation and political-affiliation retaliation are both governed by the First Amendment retaliation doctrine.[2]
A. Standard for First Amendment Retaliation Claims
We review de novo a district court’s grant of summary judgment. Int'l Union v. Cummins, Inc., 434 F.3d 478, 483 (6th Cir.2006). We review the evidence and draw all inferences in the light most favorable to the stewards as the nonmoving parties. Id.
First Amendment retaliation claims are analyzed under a burden-shifting framework. A plaintiff must first make a prima facie case of retaliation, which comprises the following elements: “(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is a causal connection between elements one and two — that is, the adverse action was motivated at least in part by his protected conduct.” Scarbrough v. Morgan Cnty. Bd. of Educ., 470 F.3d 250, 255 (6th Cir.2006). If the employee establishes a prima facie case, the burden then shifts to the employer to demonstrate “by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct.” Eckerman v. Tenn. Dep’t of Safety, 636 F.3d 202, 208 (6th Cir.2010) (internal quotation marks omitted). “Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the *295 light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant.” Id. Unlike in the McDonnell Douglas burden-shifting framework, the burden does not shift back to a plaintiff to show pretext in First Amendment retaliation claims.
B. Protected-Speech Retaliation Claim
The stewards appeal the district court’s determination that Erskine, Hall, and Perttunen did not engage in protected speech. The district court concluded that Dye engaged in protected speech when he vocalized his support for gubernatorial candidate DeVos to Post and other employees in the office. Dye, 2011 WL 2144485, at *8. These discussions were accurately depicted as protected speech by the district court,[3] and Dye’s claim therefore prevails at this stage. We will now turn to the alleged protected speech of Erskine, Hall, and Perttunen.
In a protected-speech case, the court must first discern whether the speech is protected. In order to establish this element, the stewards must show that the speech touches on a matter of public concern. Scarbrough, 470 F.3d at 255. The Supreme Court has defined “public concern” as speech “relating to any matter of political, social, or other concern to the community.” Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).
When speech does relate to a matter of public concern, the court must then apply the Pickering balancing test “to determine if the employee’s free speech interests outweigh the efficiency interests of the government as an employer.” Scarbrough, 470 F.3d at 255 (internal quotation marks omitted) (relying on Pickering v. Bd. of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). Considerations involved in this balancing test include “whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker’s duties or interferes with the regular operation of the enterprise.” Rankin v. McPherson, 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).
1. Erskine
The stewards argue that Erskine engaged in protected speech when she declined to testify at White’s confirmation hearing for fear of being fired, spoke to state senators about White, and critiqued White’s performance as Racing Commissioner to her coworkers. Appellants Br. at 19, 37. Erskine testified in her deposition that she had discussions with the offices of two state senators. The first discussion occurred when State Senator Gotchka contacted Erskine to discuss a complaint his office had received regarding a discrepancy between the times clocked by two different race dockers at a horse race. Even when reading her deposition testimony in the light most favorable to the stewards, this alleged discussion appears to be nothing more than Erskine fielding a complaint from a public official regarding the ORC’s policy of clocking horse races. It simply makes no sense to construe this interaction as protected speech related to White’s confirmation hearing or the gubernatorial election, the only two bases on which the stewards seek relief.
*296 State Senator Gotchka’s office subsequently asked Erskine if she would like to testify against White at her confirmation hearing. Erskine testified that she declined to speak at White’s confirmation hearing because “[White] was trying to find out consistently who was involved in her confirmation hearing and had made statements to other people that worked in the office.” R. 50-1 (Erskine Tr. at 72:11-14) (Page ID # 871). Erskine continued that “I chose not to for the fear of being fired. We were asked to; and had we testified, the statement was, she probably wouldn’t have been confirmed.” Id. at 73:10-12 (Page ID # 872). Such an allegation, though, does not fit into the protected-speech retaliation doctrine. If anything, Erskine is describing preemptive behavior on the part of White rather than retaliatory actions. This is confirmed by Erskine’s repeated denials, or statements that she cannot remember, that she gave any information to the state senator’s office concerning White during any of these conversations.
Additionally, after the confirmation, Erskine contacted State Senator Birkholz’s office to gather more information on an accusation made by Erskine’s friend that White had improperly spoken to state senators prior to her confirmation hearing. Specifically, Erskine inquired as to whether any policy proscribed such behavior. Erskine testified that she did not tell Senator Birkholz whether she supported White. As with the discussion regarding the race dockers, this interaction with a state senator’s office cannot support a claim of retaliation. A phone conversation with an aide in a state senator’s office in which the sole question asked was whether a policy existed is vastly different from filing a complaint, either written or oral, with a state senator concerning opposition to a public official’s confirmation. Erskine attempts to categorize this phone call as the latter, but the facts do not support reaching such a conclusion.
Erskine also testified that after working with White “on a day-to-day basis in a working relationship,” she stopped supporting White and began discussing her complaints with other employees, her family, and her peers. Id. at 57:1-58:5 (Page ID # 864). These comments, however, reflect matters of personal concern. See Thomson v. Scheid, 977 F.2d 1017, 1020-21 (6th Cir.1992) (“Not all matters discussed within a government office are of public concern, and thus internal office communication does not necessarily give rise to a constitutional claim.”). Although White is a public official, the complaints mentioned by Erskine in the record are those of a personal nature that come from working with White on a daily basis rather than those that touch on political, policy, or social matters affecting the public. See Farhat v. Jopke, 370 F.3d 580, 593 (6th Cir.2004) (“[V]iewed in the context of the complete record, we believe that the primary focus, point, or communicative purpose of Appellant’s letters was his own personal beef with the union and the school district concerning his deteriorating job situation, and his references to collusion or corruption were passing references that were incidental to the message conveyed. Thus his letters were not matters of public concern.”) (internal quotation marks and footnotes omitted). Erskine testified that “it would be a personal nature; but professionally, we had to support her;” “Well, it would be, example of not liking someone but you have to work with them, you know; so you’re professional and you do what you’re supposed to do and your duties;” and she discussed with her peers that “I didn’t—I couldn’t believe or anybody else could believe she was confirmed.” R. 50-1 (Erskine Tr. at 59:1-25) *297 (Page ID # 865). Erskine also mentioned that she was critical of certain policies that White enacted, but she could not offer any specific examples: “There were many occasions [Post and White] would do something, and it was, like, they would call me, ask me my opinion. I would tell them. I was critical of what was taking place.” Id. at 60:5-12. In sum, although Erskine spoke with many people about her disapproval of White both personally and professionally, the district court was correct in concluding that none of this testimony supports a finding that Erskine engaged in protected speech.
2. Hall
The stewards argue that Hall engaged in protected speech when he asserted his support for DeVos to licensees at races that he was working. Appellants Br. at 39. The stewards cite excerpts of White’s deposition testimony to support this argument. Id. White testified at her deposition that she had received complaints about Hall from licensees that the ORC regulates and that she discussed these complaints at a meeting with the stewards. White explained that the complaints detailed an instance in which “Hall had been campaigning on — while he was duty [sic] with licensees that we regulated.” R. 49-3 (White Tr. at 83:17-25) (Page ID # 578).[4]
Although Hall’s speech touched on a matter of public concern — the gubernatorial election — it was not protected speech under the Pickering balancing test. As the district court observed, Hall’s speech “involved his urging licensees regulated by the ORC to vote for DeVos and thus had the potential to interfere with the ORC’s efficacy and efficiency.” Dye, 2011 WL 2144485, at *8. The law is clear that speech disruptive to the effective operation of a government agency outweighs its First Amendment protections. Waters v. Churchill, 511 U.S. 661, 681, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion) (“As a matter of law, this potential disruptiveness was enough to outweigh whatever First Amendment value the speech might have had.”); Farhat v. Jopke, 370 F.3d 580, 594 (6th Cir.2004) (“Appellants ‘speech’ was highly disruptive to the point that it interfered with the effective operation of the school district’s custodial staff.”). Hall’s speech was plainly disruptive to the agency’s effective operation of its horse races. Hall was campaigning for a gubernatorial candidate on-site during work hours to individuals regulated by the agency. Therefore, the district court was correct in determining that this was not protected speech.
3. Perttunen
The stewards do not provide any evidence that Perttunen engaged in protected speech. The only evidence provided specific to Perttunen is deposition testimony in which he states that “[t]here may have been discussions amongst stewards only about who may be a better candidate for our industry to survive.” R. 47-6 (Perttunen Tr. at 54:2-4) (Page ID # 368) (emphasis added). This evidence does not reflect that Perttunen ever took part in these discussions or that these discussions even occurred. The district court was therefore correct in determining that Pert *298 tunen did not provide evidence that he engaged in protected speech.
In sum, the district court did not err in granting summary judgment for the defendants on the political-speech retaliation claims of Erskine, Hall, and Perttunen or in concluding that Dye engaged in protected speech.
C. Political-Affiliation Retaliation Claim
The stewards contend that the district court erred in granting summary judgment for the defendants on the basis that none of the stewards had established that they were affiliated with the Republican Party or gubernatorial candidate DeVos. Appellants Br. at 25. Specifically, they argue that the district court improperly applied the protected-speech retaliation standard when evaluating the political-affiliation retaliation allegations. Id. at 30. The defendants rejoin that the stewards did not provide sufficient evidence to support a claim of protected-speech or political-affiliation retaliation and that the district court engaged in the correct analysis. Appellees Br. at 37.
1. Political-Affiliation Retaliation Claim Standard
The district court framed the political-affiliation allegations as those arising under a retaliation claim; however, it then stated the basic principles of the political-patronage dismissal standard — that taking adverse employment actions based on political affiliation is unconstitutional under the First Amendment unless there exists a vital governmental interest in doing so. Dye, 2011 WL 2144485, at *12. When it turned to its analysis, the district court appeared to apply the retaliation standard that it had outlined in the protected-speech portion of its order. Id. at *13. It is thus unclear which standard the district court applied because under each test, a plaintiff must show that he was adversely affected as a result of engaging in protected First Amendment activity. This issue was the only one reached by the district court in this portion of its opinion.
Under either standard, the district court erred. The court summarily determined that “[t]o the extent Plaintiffs’ association/affiliation claim arises from their political speech concerning the 2006 gubernatorial election, those claims are addressed above.” Id. The court then concluded that because plaintiffs cannot show that White or Post knew about their affiliation with the Republican Party, their political-affiliation retaliation claim fails. Id. When utilized properly, however, the two standards can produce distinct conclusions. For example, while an individual’s improper campaigning during work hours may not be protected speech, it certainly could alert those who heard the speech of his political affiliation, thereby fulfilling part of the political-affiliation standard. Therefore, the district court erred in assuming that reviewing the same evidence to determine if the stewards engaged in a different protected activity would necessarily result in the same conclusion.
Moreover, the district court erred in its analysis of the stewards’ perceived political-affiliation retaliation allegations by concluding that actual affiliation is required. Id. at *12 n. 8. At issue is whether an individual claiming to have been retaliated against because of her political affiliation must show that she was actually affiliated with the particular political group or candidate. Here, as will be shown in greater detail below, the stewards have put forth evidence demonstrating that White and Post operated under the assumption that each of the stewards was affiliated with DeVos and the Republican Party.
*299 We have not yet addressed whether actual affiliation is required for First Amendment political-affiliation retaliation claims. The First Circuit squarely addressed this issue in Welch v. Ciampa, 542 F.3d 927 (1st Cir.2008), a case in which an employee alleged that the defendants attributed to him an affiliation and retaliated against him as a result. Id. at 938-39. The court discussed the evidence put forth by the employee as follows: “But neither active campaigning for a competing party nor vocal opposition to the defendant’s political persuasion are required. In this case, Welch adduced evidence that officers who did not support the recall election were perceived as opposing it.” Id. at 939. The First Circuit then concluded that “[w]hether Welch actually affiliated himself with the anti-recall camp is not dispositive since the pro-recall camp attributed to him that affiliation.” Id. The court further explained that although active support for a political group would help an employee meet his evidentiary burden, such a showing is not required in order to guarantee First Amendment protections. Id.
The Tenth Circuit has also recognized that the critical inquiry in certain political-affiliation retaliation cases is the motivation of the employer, stating that the “only relevant consideration is the impetus for the elected official’s employment decision vis-a-vis the plaintiff, i.e., whether the elected official prefers to hire those who support or affiliate with him and terminate those who do not.” Gann v. Cline, 519 F.3d 1090, 1094 (10th Cir.2008). Moreover, Gann expressly rejected two concerns raised by the defendant: “that it was impossible for Ms. Gann’s apolitical status to constitute a substantial or motivating factor in his decision to discharge her because Ms. Gann never made her political non-affiliation known to him” and that affording relief in this case would “sanction[ ] future patronage claims by any public employee who keeps her political beliefs private but suffers from an adverse employment decision.” Id. The Tenth Circuit discredited these arguments by reiterating the well-established principle that “a plaintiff must establish a causal link between the plaintiffs political beliefs, or lack thereof, and the defendant’s adverse em7 ployment decision with respect to the plaintiff.” Id. The court further explained that “[tjhere are, of course, many ways to establish such a link beyond requiring a plaintiff to tell her boss that she does not subscribe to his political beliefs.” Id.
The Third Circuit, however, has rejected a perceived-support theory, stating that “Plaintiffs in First Amendment retaliation cases can sustain their burden of proof only if their conduct was constitutionally protected.” Ambrose v. Twp. of Robinson, Pa., 303 F.3d 488, 495 (3d Cir.2002). The court relied upon the following statement in Waters: “[w]e have never held that it is a violation of the Constitution for a government employer to discharge an employee based on substantively incorrect information.” Ambrose, 303 F.3d at 495 (quoting Waters, 511 U.S. at 679, 114 S.Ct. 1878).[5]
*300 An application of this principle in Waters to the First Amendment context, however, is disingenuous. When read in context, it is clear that this sentence relates only to due-process violations. In fact, the subsequent sentence references directly the due process afforded public employees: “Where an employee has a property interest in her job, the only protection we have found the Constitution gives her is a right to adequate procedure.” Waters, 511 U.S. at 679, 114 S.Ct. 1878. Moreover, we have previously recognized this principle as one concerning due process: “[i]n Waters, a plurality of the Supreme Court held the Connick test should be applied to what the government reasonably thought was said, i.e. the government should not be held to the same evidentiary standards used by a jury when making its decision whether or not to terminate an employee based on what is thought to be unprotected speech.” Dambrot v. Cent. Mich. Univ., 55 F.3d 1177, 1189 n. 9 (6th Cir.1995). Given the plain meaning of Waters, along with our prior interpretation of its holding, we find the Third Circuit’s conclusion unpersuasive.
For the reasons stated, we adopt the reasoning of the First and Tenth Circuits and hold that retaliation based on perceived political affiliation is actionable under the political-affiliation retaliation doctrine.
2. Analysis
In arguing that the stewards were affected adversely because of their political affiliation with the Republican Party, the stewards focus heavily on the culture' of the workplace. The stewards paint a picture of a state agency divided by political affiliation, in which White, a Democrat, retaliates and otherwise treats poorly those who do not support her or then-Governor Granholm. Appellants Br. 40-47. In support of this argument, the stewards present evidence applicable to all stewards and evidence concerning specific stewards.
The strongest evidence in support of retaliation against all stewards on the political-affiliation basis is the stewards’ description of a meeting on January 4, 2007, that was attended by White, Post, Dye, Erskine, Hall, Perttunen, and Pete O’Hare, another steward.[6] The stewards argue that White “accused them of supporting Dick DeVos in the 2006 Michigan Gubernatorial election.... [and of] trying to derail her confirmation hearing by trying to convince others to vote for Republican candidate Dick DeVos.”[7] Id. at 16. Erskine stated: “She knew we voted for DeVos because she said we voted for De- *301 Vos and, in turn to get rid — to bring a republican in, to get rid of her because she’s democrat [sic].” R. 50-1 (Erskine Tr. at 110:16-19) (Page ID # 890). Erskine continued that Post “made the statement that, because we wrote our senators and our governor against her confirmation hearing, that until we conformed to her ways, we weren’t going to get nothing [sic].” Id. at 111:7-12. Hall reiterated this description of the meeting: “In a meeting with the commissioner, [Post] indicated one of the reasons for losing our banked days is because we supported De-Vos.” R. 47-7 (Hall Tr. at 62:7-9) (Page ID #416). Perttunen similarly testified that “[i]n that meeting at Sports Creek in January, it was told to us by Christine White and Gary Post, due to us supporting Mr. DeVos, they would be taking away our banked time, and until we conformed to her ways, we would not be getting it back.” R. 47-6 (Perttunen Tr. at 57:17-21) (Page ID # 371).[8]
Additionally, the stewards provide affidavits of other employees of the ORC detailing the political culture of the agency and White’s treatment of non-Democrats. The district court summarily dismissed every affidavit produced by the stewards in a single footnote, stating “[a]ffidavits that state Defendant White created a hostile work environment yet fail to set out facts showing that the hostility was because of political speech or association do nothing to advance Plaintiffs’ First Amendment retaliation claim.” Dye, 2011 WL 2144485, at *13 n. 11. Although certain affidavits are insufficient in this regard,[9] this description is not true of every affidavit presented. For example, Brian Brown, a regulation agent at the ORC from 1998 to 2009 states that “[d]uring my time with the ORC, I witnessed Christine White and Gary Post create a work environment based on favoritism based on political patronage,” that “[e]mployees with similar political ideals would receive more hours, access to promotions, and overall favorable treatment,” and that “[d]uring meetings with Gary Post, he would make clear his animosity toward the Plaintiff group.” R. 49-8 (Brown Aff. at ¶¶ 1-5) (Page ID # 635-36). Brown also states that during meetings, Post would say that “ ‘he did not trust the stewards’ ” and would “make clear his animosity toward the Plaintiff group.” Id. ¶¶ 5-6 (Page ID # 636). Richard Jewell, an investigative supervisor at the ORC, declared that “[i]f employees did not support [White and Post] on any issue, the employees would be harassed and subject to a hostile work environment” and that “[approximately one year into [White’s] appointment, [Post] stated to me that ‘those stewards need to get on the same page as her’ referring to [White]. He meant not only philosophically on the same page, but politically.” R. 49-9 (Jewell Aff. at ¶¶ 1-4) (Page ID # 638-39). These affidavits corroborate the deposition testimony of the stewards.
*302 There is also evidence that White and Post perceived an affiliation with DeVos and the Republican Party specific to certain stewards. To begin, Dye’s conversations with Post and other coworkers concerning the gubernatorial election would make known his political affiliation. Dye testified at his deposition that in the fall of 2006, prior to the gubernatorial election, he would “have occasion to go to lunch downstairs in the office and it was discussed that racing, by Mr. Post would say or did say that we are much better off with Granholm than we would be with DeVos.” R. 47-5 (Dye Tr. at 36:4-9, 41:1-10) (Page ID # 319-20). Dye continued that “[m]y statements would be DeVos is republican, is a business person and I think the state needs a business person'into it. So we had occasion to discuss that issue.” Id. 36:10-13 (Page ID # 319). Dye also explained that as part of conversations in the office, he would tell others that DeVos was better because of his business background. Id. 42:6-22. (Page ID # 321). Erskine’s deposition testimony corroborates Dye’s assertion that Post would speak in support of Granholm around the office: “[Post] talked about Jennifer Granholm was the way to go [sic] if the horsemen felt they could get the slot machines in to help them with racing, to pick up better purse pools.” R. 50-1 (Erskine Tr. at 108:6-9) (Page ID # 888).
The district court appears to have denied Dye’s claim because Dye never affirmatively stated that he was a member of the Republican Party. Dye, 2011 WL 2144485, at *13. This is a rigid interpretation of the evidence; from these discussions, Post easily could have inferred an affiliation with the Republican Party and support for DeVos. See Murphy v. Cockrell, 505 F.3d 446, 452 (6th Cir.2007) (“[S]upport for a political candidate falls within the scope of the right of political association.”) (internal quotation marks omitted); Gann v. Cline, 519 F.3d 1090, 1094 (10th Cir.2008) (“There are, of course, many ways to establish such a link beyond requiring a plaintiff to tell her boss that she does not subscribe to his political beliefs.”).
Additionally, although the speech that Hall engaged in was not protected, it certainly alerted White and Post to Hall’s political affiliation. Moreover, White brought Hall’s campaigning to the attention of the other stewards as an example of inappropriate speech in the January 4, 2007 meeting. Erskine’s deposition testimony reflects that she did not discuss politics at work, yet she testifies that she was grouped in with those who had expressed support for DeVos: “I did not tell anybody to vote, nor pursue that.... She knew we voted for DeVos because she said we voted for DeVos.” R. 50-1 (Erskine Tr. at 109:19-110:19) (Page ID # 889-90).
There is ample evidence to support the stewards’ contention that Post and White attributed a political affiliation to the stewards, especially at the prima facie stage. An employer that acts upon such assumptions regarding the affiliation of her employees should not escape liability because her assumptions happened to be faulty.
III. ADVERSE EMPLOYMENT ACTIONS
The stewards allege that numerous adverse actions were taken against them because they engaged in protected speech and were assumed to be affiliated with the Republican Party. Certain actions, such as demotions and terminations, relate to specific stewards. The remainder are alleged as actions taken against every steward. The district court categorized the actions in the following manner:
(1) the Fall 2006 decision to eliminate the position of Administrative Liaison *303 Steward; (2) the decrease in assigned work days (and thus pay) for Plaintiffs; (3) the adoption of stricter timekeeping procedures, including (a) the scheduling and authorization of full days versus half days, and (b) the elimination of the practice of “banking time” in a pay period outside the period work was performed; (4) the elimination of travel expense reimbursements in connection with the Harness Stewards’ bi-annual certification conference in November 2006 and 2008; and (5) the elimination of two Harness Stewards — Plaintiffs Dye and Erskine — in June 2009.
Dye, 2011 WL 2144485, at *13. As we discuss more fully below, the district court implicitly or explicitly concluded that many of these actions constituted adverse employment actions, and the defendants do not challenge these determinations in their brief. In such instances, we will not consider the merits of categorizing these alleged actions as adverse and will instead continue on to evaluate whether the district court was correct in its causal-connection analysis.
In a First Amendment retaliation claim, we must consider whether the alleged adverse employment action “would chill or silence a person of ordinary firmness from future First Amendment activities.” Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro, 477 F.3d 807, 822 (6th Cir. 2007) (internal quotation marks omitted). “The term ‘adverse action’ has traditionally referred to actions such as discharge, demotions, refusal to [h]ire, nonrenewal of contracts, and failure to promote.” Handy-Clay v. City of Memphis, 695 F.3d 531, 545 (6th Cir.2012) (internal quotation marks omitted) (alteration in original). However, we also recognize that “we are required to tailor[ ] our analysis under the adverse action prong to the circumstances of this specific retaliation claim.” Mezibov v. Allen, 411 F.3d 712, 721 (6th Cir.2005).
A. Dye’s Demotion
Dye’s demotion from Administrative Liaison Steward to state steward constituted an adverse employment action. See Eckerman, 636 F.3d at 208 (“[T]he district court found, and we agree, that the demotion from lieutenant to sergeant alone constitutes sufficient adverse action to satisfy this element of plaintiffs retaliation claim.”). The defendants do not dispute this characterization and instead focus their arguments on the causal-connection element. Appellees Br. at 51.
B. Dye’s and Erskine’s Terminations
It is elemental that terminations are adverse employment actions. See v. City of Elyria, 502 F.3d 484, 494 (6th Cir.2007) (concluding that when terminated, “See undeniably suffered an adverse action that would chill the free speech rights of an ordinary person”). The parties do not dispute this characterization. Appellees Br. at 54-55.
C. Decrease in Work Days and Pay
A decrease in work days and pay is an adverse employment action. Clay v. United Parcel Serv., Inc., 501 F.3d 695, 710-11 n. 6 (6th Cir.2007) (“We fail to understand how a loss of pay is anything other than an adverse employment action, regardless of the form in which the deprivation occurred.”); see also Miller v. City of Canton, 319 Fed.Appx. 411, 419 (6th Cir.2009) (“Although he was later made whole in December 2005, a reasonable jury could find that the loss of pay for sixty days would constitute a hardship to the average officer and would chill the exercise of First Amendment rights.”). The parties do not dispute that this is an adverse employment action, and the district court *304 did not reach this issue. Appellees Br. at 51-53.
D. Half-Day Employment
Although the district court concluded that the stricter timekeeping measures requiring advance authorization to extend a scheduled half day at the race track to a full day was not an adverse action, Dye, 2011 WL 2144485, at *20, the stewards have waived review of this issue by not raising it in their brief or at oral argument. Thaddeus-X v. Blatter, 175 F.3d 378, 403 n. 18 (6th Cir.1999) (en banc).
E. Banked-Time System
On January 4, 2007, White discontinued the use of the banked-time system. The banked-time system enabled an employee to reserve receipt of payment on any time worked in excess of ten full days in a fourteen-day period. The employee could then fill in a pay period where he worked less than ten full days with these banked days. As explained by Post, “[f|or example, if a Harness Steward worked 11 days in [a] two week pay period, they would submit 10 days for payment on their timesheet, and put one day in the ‘bank.’ ” R. 47-4 (Post Aff. at ¶ 13) (Page ID # 301). Essentially, by choosing to bank time, the employee was electing to receive compensation for time worked in a more evenly distributed manner throughout the year, akin to the compensation structure of a salaried employee.
We have addressed the concept of banked time in the context of retaliation under the Fair Labor Standards Act. Adair v. Charter Cnty. of Wayne, 452 F.3d 482 (6th Cir.2006). In Adair, the plaintiffs alleged that a freeze on the use of banked time constituted an adverse employment action. Id. at 490. Under the freeze, “Plaintiffs simply were required to utilize vacation days for just that—vacation—• rather than permitted to save vacation time and later exchange it for pay.” Id. Because “[t]his did not result in a material loss of benefits, termination, demotion, transfer, or alteration of job responsibilities,” we held that the plaintiffs had failed to show that freezing the use of banked time was an adverse employment action. Id.
Given that we use a distinct standard in First Amendment retaliation claims, Adair can instruct us only in a limited manner. In a First Amendment retaliation claim, we must ask whether the alleged action would chill or silence a person of ordinary firmness. The stewards have provided evidence that the banked-time program was a key benefit to these stewards. Although White and Post changed the structure of compensation in a way that would not inflict any potential monetary losses, as would typically be required under the FLSA, it certainly imposed a different type of financial burden on the stewards. The lack of a steady income, especially when combined with the decrease in racing days, could certainly chill or silence a person of ordinary firmness. Moreover, as is explained more fully below, see infra Part IV. E, there is evidence in the record that White discontinued this program in order to silence the stewards. We therefore find that the district court erred with respect to the banked-time system.
F.Travel-Expense Reimbursements
The district court did not discuss whether the decision to discontinue the practice of reimbursing the stewards for travel expenses when they attended biannual certification conferences constituted an adverse employment action. Dye, 2011 WL 2144485, at *23. Instead, the district court concluded that the stewards did not establish a causal connection between the *305 elimination of travel-expense reimbursements and the protected activity. Id. However, we decline to reach either aspect of the district court’s analysis, as the stewards have waived review of both issues by not raising either in their brief or at oral argument.[10] Thaddeus-X, 175 F.3d at 403 n. 18.
IY. CAUSAL CONNECTION
The stewards argue that the district court erred in concluding that none of the adverse employment actions were effectuated because of the protected activity. “In order to establish a causal connection between the protected conduct and the adverse action, plaintiff must produce enough evidence of a retaliatory motive such that a reasonable juror could conclude that the [adverse employment action] would not have occurred but for his engagement in protected activity.” Eckerman v. Tern. Dep’t of Safety, 636 F.3d 202, 209 (6th Cir.2010). “A causal link can be shown through direct or circumstantial evidence, including showing temporal proximity between engaging in protected activity and suffering an adverse employment action that may create an inference of causation.” Id. Moreover, we have determined that incidents of misconduct that do not rise to the level of an adverse employment action “may be relevant at trial to show a pattern of mistreatment on the job based on plaintiff’s protected activities.” Id. at 208-09.
A. Dye’s Demotion
The stewards argue that the temporal proximity between Dye’s protected activity and his demotion satisfies the causal-connection element of his First Amendment retaliation claim. Dye’s protected activity — the conversations with Post regarding the gubernatorial election and the perceived political affiliation stemming from those conversations — both occurred in the fall of 2006, prior to the election. Post averred that he informed Dye of his demotion at some point between October 11, 2006, the date on which Post was appointed Deputy Commissioner, and November 8, 2006, the date on which Dye’s administrative duties in the Lansing office ceased. In this meeting, Post informed Dye that his demotion would take effect at the expiration of his contract on December 31, 2006, and that his duties in the Lansing office would cease on November 8, 2006. Dye testified that he discussed the gubernatorial election with Post in the fall of 2006, prior to November 7, 2006, the date of the election. At the very earliest, then, these discussions occurred on some date in September 2006, when Post was finishing his duties as the contract management consultant. Although we do not have a specific date for either the political discussions or the meeting regarding the demotion, the notice of demotion must have occurred within two months, if not sooner, of the protected activity.
In Mickey v. Zeidler Tool & Die Co., 516 F.3d 516 (6th Cir.2008), we clarified that temporal proximity alone can, in certain circumstances, suffice to show a causal connection in a retaliation case: “Where an adverse employment action occurs very *306 close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation.” Id. at 525. We also recognized the limitations to using temporal proximity alone — that “where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.” Id.
As we explained in Dixon v. Gonzales, 481 F.3d 324, 334 (6th Cir.2007), and recently reiterated in Gambill v. Duke Energy Corp., 456 Fed.Appx. 578, 589 (6th Cir. 2012), “this Court has typically found the causal connection element satisfied only where the adverse employment action occurred within a matter of months, or less, of the protected activity.” A lapse of two months, as is the case here, is sufficient to show a causal connection, and the district court erred in holding otherwise. See, e.g., Seeger v. Cincinnati Bell Tel. Co., 681 F.3d 274, 283 (6th Cir.2012) (“We agree with the district court that the nearness in time between Seeger’s return from FMLA leave and his termination — three weeks after his reinstatement and less than two months after he first notified CBT of his medical leave — suffices in these circumstances to meet the low threshold of proof necessary to establish a prima facie case of retaliatory discharge.”); Bryson v. Regis Corp., 498 F.3d 561, 571 (6th Cir.2007) (explaining that three months is sufficient to show temporal proximity because “a plaintiffs burden in establishing a prima facie case is not intended to be an onerous one”) (internal quotation marks and alterations omitted); Singfield v. Akron Metro. Housing Auth., 389 F.3d 555, 563 (6th Cir.2004) (concluding that a lapse of three months is a sufficient temporal proximity to show causal connection).
B. Dye’s and Erskine’s Terminations
The stewards also argue that the district court erred in concluding that the stewards failed to show a causal connection between the protected activity and the June 2009 terminations. As with Dye’s demotion, the stewards rely wholly on temporal proximity to show a causal connection. The protected activity at issue began in the lead-up to the 2006 gubernatorial election and ended, when viewing the facts in the light most favorable to the stewards, in the winter of 2007. Both Dye and Erskine were fired in June of 2009, more than two years after the protected conduct.
A lapse of more than two years between the protected activity and the adverse employment action is simply insufficient to show a causal connection based solely on a temporal-proximity theory. Dixon, 481 F.3d at 334 (“[T]he Supreme Court held that a finding of causal connection was not warranted where, among other things, almost two years elapsed between the employee’s participation in protected activity and the adverse employment decision.”) (citing Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)). Because the stewards do not proffer any additional evidence, we conclude that the stewards fail to show a causal connection as to the terminations.
C. Decrease in Work Days and Pay
The district court granted the defendants’ motion on this portion of the stewards’ claims on two bases: (1) the stewards’ failure to show a causal connection and (2) the convincing evidence proffered by the defendants in support of a legitimate reason to take this action. On *307 appeal, however, the stewards argue only that the district court erred in concluding that the defendants had a legitimate reason to decrease the work days and pay. Appellants Br. at 43-46. Such an argument ties our hands. It is a basic tenet in retaliation claims that the burden shifts to the employer only after the employee has established a prima facie case. Countering the defendants’ proffered reasons, as is done in the stewards’ brief, does not establish a prima facie case. Under this framework, we cannot consider the accuracy of the district court’s determination that the defendants established legitimate reasons to take these employment actions unless the stewards have first met their burden of showing a causal connection. Because the stewards have not even referenced the prima facie case in their brief, let alone a specific theory upon which they rely, we must affirm the district court on this portion of its order.
D. Banked-Time System
The stewards presented evidence that White and Post eliminated the practice of banking days because of the stewards’ perceived affiliation with the Republican Party. Perttunen testified that “[i]n that meeting at Sports Creek in January, it was told to us by Christine White and Gary Post, due to us supporting Mr. De-Vos, they would be taking away our banked time, and until we conformed to her ways, we would not be getting it back.” R. 47-6 (Perttunen Tr. at 57:17-21) (Page ID # 371). Hall also testified that “[i]n a meeting with the Commissioner, he indicated one of the reasons for losing our banked days is because we supported De-Vos.” R. 47-7 (Hall Tr. at 62:7-9) (Page ID #416). Further, Hall recalled that each of the four plaintiffs in this case was present at that meeting, as well as another steward, Post, and White. Id. at 63:24-63:3 (Page ID # 416-17); see also R. 50-1 (Erskine Tr. at 111:1-3) (Page ID # 890) (stating these individuals were present at the meeting).
Moreover, there is a temporal connection nearly identical to that involved in Dye’s demotion. White and Post announced the change in the banked-time system at the January 4, 2007 meeting, just two months after the gubernatorial election. Therefore, we conclude that the stewards have established a prima facie case for the loss of the banked-time system.
V. DEFENDANTS’ PROFFERED NON-DISCRIMINATORY REASONS
Once the stewards have established a prima facie case, the burden shifts to the defendants, who must show by a preponderance of the evidence that “the employment decision would have been the same absent the protected conduct.” Eckerman v. Tenn. Dep’t of Safety, 636 F.3d 202, 208 (6th Cir.2010) (internal quotation marks omitted). The stewards were successful in establishing a prima facie case on two adverse employment actions: Dye’s demotion on the basis of his political speech and political affiliation and the stewards’ loss of the banked-time system on the basis of political affiliation.
A. Evidentiary Objection
The defendants rely upon Post’s affidavit, White’s deposition testimony, and Post’s deposition testimony to demonstrate that they would have made the decision to demote Dye absent the protected activity. The stewards object to the use of Post’s post-deposition affidavit as a violation of their Fourteenth Amendment due-process right, arguing that Post introduced statements in this affidavit that were directly responsive to questions that he had al *308 ready answered in his deposition testimony. Appellants Br. at 31-33. The stewards specifically object only to the portions of Post’s affidavit concerning the reasons behind Dye’s and Erskine’s terminations. Because we have held that the stewards have not established a causal connection for these adverse employment actions, we do not need to review the district court’s use of the affidavit in this manner. Insofar as the stewards attempt to make a blanket objection to the entire affidavit, their objection is insufficient. Merely pointing out that an affidavit was made after the deposition does not render the entire affidavit improper. Rather, the stewards must show that the affidavit directly contradicts the deposition testimony or that the affidavit was effectuated for the purpose of creating a sham issue of fact. Aerel, S.R.L. v. PCC Airfoils, L.L.C., 448 F.3d 899, 908-09 (6th Cir.2006). They have not shown either.
B. Dye’s Demotion
The defendants argue that they demoted Dye “for budgetary reasons and certain functions were being reassigned to [Post].” Appellees Br. at 9. In support of this argument, the defendants cite White’s deposition testimony, in which she states the decision was made “based on the fact that [Post] felt that he could do those responsibilities.” R. 47-2 (White Tr. at 87:12-15) (Page ID #282). The defendants also rely on the statement in Post’s affidavit in which he avers as follows:
The Racing Commissioner determined, and I agreed that the amount and type of work required could no longer justify the full time position of Administrative Steward in the Lansing office. There was simply not enough work to justify the continued cost of the position. Additionally, budget concerns required an examination of how staff were being utilized and the best use of that staff. Many of the tasks at an administrative level, such as policy writing, scheduling and budget development, require excellent writing skills and proficiency with electronic spreadsheets, for example.
R. 47-4 (Post Aff. ¶ 8) (Page ID # 297-98). Post also avers that Dye did not have the necessary computer or writing skills for the position, a less convincing statement given that there is also evidence on the record indicating that Dye had been the Administrative Steward for eight years at that point. Id The defendants also point to Dye’s deposition testimony, in which he states that Post provided the reason for his demotion as “[b]udgetary concerns.” R. 47-5 (Dye Tr. at 29:12-17) (Page ID # 317).
Although the defendants provide evidence in support of their proffered reason for Dye’s demotion, this evidence is nonetheless insufficient to show that no reasonable juror could fail to return a verdict for Dye. The temporal proximity of the demotion and the protected speech, as well as the testimony concerning the political atmosphere of the agency leading up to the gubernatorial election, create a genuine issue of material fact as to the reason behind Dye’s demotion. Moreover, in the First Amendment context, “[a] defendant’s motivation for taking action against the plaintiff is usually a matter best suited for the jury.” Paige v. Coyner, 614 F.3d 273, 282 (6th Cir.2010). The district court thus erred in granting the defendants’ motion for summary judgment on Dye’s retaliation claim.
C. Banked-Time System
The defendants argue that they eliminated the banked-time system because they “were concerned about the appropriateness, accountability, and lack of management oversight for this process.” *309 Appellees Br. at 18. In support of this argument, the defendants present Post’s affidavit, in which he explains that he and White “were concerned about the appropriateness, accountability and lack of management oversight of this process and after discussing it with the Commission’s Human Resources Director, the decision was made to discontinue this practice.” R. 47-4 (Post Aff. at ¶ 13) (Page ID # 301). The defendants also rely upon White’s deposition testimony, in which she denies making any statement that she eliminated the banked-time system because of the stewards’ political affiliation.
The district court concluded, that based on this evidence, no reasonable juror could find for the stewards. Dye, 2011 WL 2144485, at *23. We disagree. The totality of the evidence shows that there is a credibility determination to be made by the factfinder as to whether White stated that she was eliminating the banked-time system on the basis of the stewards’ political affiliation. White’s deposition testimony, coupled with Post’s broad explanation in his affidavit, does not require a reasonable juror to find for the defendants. We therefore conclude that a genuine issue of material fact exists as to the banked-time system.
VI. CONCLUSION
For the reasons stated above, we reverse the district court on Dye’s protected-speech and political-affiliation retaliation claims, and on each steward’s political-affiliation retaliation claim based on the loss of the banked-time system. We affirm the district court on Erskine, Hall, and Perttunen’s protected-speech retaliation claims and on each of the stewards’ remaining political-affiliation retaliation claims.

. The stewards also cite political-patronage dismissal cases in their brief. Although this raises some ambiguity as to the nature of the claim, the record suggests that they are asserting a political-affiliation retaliation claim rather than a political-patronage dismissal claim. The operative complaint alleges that "Defendants’ actions in limiting and terminating Plaintiffs’ employment because of their constitutionally protected speech and political association abridged their rights to freedom of speech and political association in violation of the First and Fourteenth Amendments to the U.S. Constitution.” R. 14 (Second Am. Compl. at ¶ 61) (Page ID #76). The complaint also specifically alleges retaliation for political views: "In retaliation for their differing political views.Id. at ¶40 (Page ID #73).
Further, the legal framework for a political-patronage dismissal claim is entirely distinct from a First Amendment retaliation claim. Under the political-patronage doctrine, we must first ”ask[] whether the party asserting that he was wrongfully terminated has produced sufficient evidence for a jury to find that he was discharged because of his political beliefs or affiliations.” Lane v. City of LaFollette, Tenn., 490 F.3d 410, 419 (6th Cir. 2007). If this burden is met, "then the burden shifts to the employer to demonstrate that the terminated party’s job was one for which political affiliation was an appropriate requirement.” Id.

. The Supreme Court has clearly established that First Amendment protections extend to independent contractors hired by the state. O’Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712, 714-15, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996).

. Neither side disputes this conclusion or provides any evidence controverting the underlying facts. Appellees Br. at 36, 43, 51.

. Additionally, the district court analyzed statements made by Hall in his deposition that he expressed opposition to White’s confirmation to the other stewards. Dye, 2011 WL 2144485, at *10. As the stewards do not make any arguments concerning these stateinents and do not cite this deposition testimony in their brief, any argument regarding these statements is abandoned. Thaddeus-X v. Blatter, 175 F.3d 378, 403 n. 18 (6th Cir. 1999) (en banc).

. Several circuits have stated similar principles to those propounded by the Third Circuit, yet only with respect to protected speech. Wasson v. Sonoma Cnty. Junior College, 203 F.3d 659, 663 (9th Cir.2000) ("Accordingly, there can be no First Amendment claim when an employee is falsely accused of making statements uttered by someone else.”); Jones v. Collins, 132 F.3d 1048, 1053 (5th Cir.1998) (“[R]etaliation based on this perception, in the absence of any actual expression by Jones that is subject to First Amendment protection, does not constitute a constitutional violation.”); Barkoo v. Melby, 901 F.2d 613, 619 (7th Cir.1990) ("To the extent Barkoo alleges that her employers retaliated against her be *300 cause they thought she was engaged in First Amendment protected speech on an issue of public concern, we reject the notion that this allegation brings her claim within the requirements of § 1983.”). Because perceived political-affiliation retaliation is the only issue before us now, we do not reach the question whether a plaintiff can allege a protected-speech retaliation claim. See Welch, 542 F.3d at 938-39 (finding an actionable political-affiliation retaliation claim where political affiliation was attributed to the plaintiff, yet on the same facts concluding that the plaintiff did not show “an actionable violation of his right to free speech”).

. The argument that the stewards' claim fails because a fifth steward was present at this meeting is unavailing. The evidence shows that White and Post attributed a political affiliation to each of the five stewards, including the four involved in this case, and we do not need to inquire as to why O’Hare is not a party to this action.

. The second part of this argument is illogical. The confirmation hearing preceded the gubernatorial election by one year. This hearing could not have been derailed by convincing members of the agency to vote for DeVos.

. The stewards also reference an alleged meeting that occurred in October 2006. Appellants Br. at 14. Appellants argue that all four stewards were present when Post made statements that Granholm was the way to go and also when Post accused Hall and Erskine of attempting to have White removed by convincing individuals to vote for DeVos. Id. Although this argument is made repeatedly in their brief, the stewards provide no evidence of this meeting having occurred. The stewards point to Dye’s deposition testimony in which he describes the conversations he had with Post in the fall of 2006 for support and to the allegations in the Second Amended Complaint. Neither of these provide the requisite evidentiary basis for this alleged meeting.

. For example, Martin Vandevelde describes alleged apolitical and non-speech related actions taken against him by White and Post. R. 49-10 (Vandevelde Affidavit) (Page ID # 640-642).

. In their statement of facts, the stewards describe the following events: "On November 12 through November 15, 2006, Plaintiffs participated in a biannual continuing education conference for stewards, located in Louisville, Kentucky. On all previous conference trips, Plaintiffs were reimbursed for their travel expenses. When Plaintiffs returned from this trip in November 2006, they were told that their expenses would not be reimbursed.” Appellants Br. at 15-16 (internal citations omitted). However, the stewards do not even reference these facts in their legal argument or in the section of their brief detailing the genuine issues of material fact.