NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0671n.06
No. 16-3297

**FILED**
Dec 14, 2016
DEBORAH S. HUNT, Clerk

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| DR. MIN LI, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| DR. QI JIANG, et al., | ) | COURT FOR THE |
| | ) | NORTHERN DISTRICT OF |
| Defendants-Appellees. | ) | OHIO |
| | ) | |
| | ) | |

BEFORE:     DAUGHTREY, ROGERS, and COOK, Circuit Judges.

ROGERS, Circuit Judge.  Min Li, a sociology professor of Chinese origin, challenges the denial of her tenure application on the ground that she was discriminated against by her department chair, also of Chinese origin, for refusing to forward an email supporting some protests in China. The tenure application was weak for several reasons, and was denied several levels up the administrative chain by the university president.  Accordingly, the district court properly determined that there was not a sufficient showing of national-origin discrimination by the department chair, or that the university president was the department chair's "cat's paw." The district court also properly rejected Li's First Amendment retaliation claim because Li failed to create a genuine issue of material fact that she would have been granted tenure if it had not been for the email incident.

The facts of this case are set forth in greater detail by the district court. *Li v. Jiang*, 164 F. Supp. 3d 1012, 1014-18 (N.D. Ohio 2016). Min Li joined Youngstown State University's (YSU) sociology department in 2008, on the recommendation of its then-chair, Qi Jiang. Although hired as a tenure-track professor, Li never moved her family with her to Ohio, as she had said she would do, nor did she cut ties to her prior academic employer in Michigan, Ferris State University, for which she continued to teach nearly a full load of courses online. Meanwhile, despite Li's plans to present and publish her research over the course of two year-long grants awarded by YSU, nothing ever materialized. By her fourth year, Li nevertheless decided to undergo pre-tenure review, and Jiang and other university personnel duly voiced their concerns about Li's spotty scholarly record and apparent disengagement from the department. Li, however, chose to apply for tenure the following year anyway. Her departmental colleagues unanimously supported awarding Li tenure, but Jiang ultimately recommended against it—a judgment that YSU's president would twice affirm. Li later raised as relevant an email that Jiang had forwarded to Li while she was going up for tenure, about protests then occurring in their native Shanghai, China. Jiang demanded to know whether Li had forwarded it to others as requested and, learning that Li had not, she allegedly lashed out at Li for "betraying" their fellow Shanghainese.

Li sued Jiang and YSU in state court, alleging, along with several state law claims, that she was denied tenure on the basis of her national origin, in violation of Title VII of the Civil Rights Act of 1964, and that Jiang had retaliated against her for declining to forward Jiang's email, in violation of her First Amendment rights under 42 U.S.C. § 1983. After removing to federal court, the defendants sought and were granted judgment on the pleadings on Li's state

law claims. They then moved for summary judgment on the Title VII and § 1983 claims, which the district court also granted.

As to the Title VII claim, the district court concluded that Li had failed to create a genuine issue of material fact under either of her posited theories of national origin discrimination: the first a theory of intentional discrimination based on circumstantial evidence, and the other a so-called "cat's paw" theory of liability, where "an unbiased decisionmaker takes an adverse action based on conduct of a supervisor motivated by discriminatory animus." Drawing on the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the court noted under the first theory that, even if it "generous[ly]" assumed that Li could satisfy her burden of establishing a prima facie case of national origin discrimination, YSU had nevertheless provided a legitimate, non-discriminatory reason for denying Li tenure:

> YSU contends that it denied tenure to Li because "[a]s of September 2012, she failed to produce a record of scholarship sufficient to deserve tenure." The record reflects that Jiang (Li's Department Chair), Furnish (the Dean), Khawaja (Provost), the tenure appeal committee, and Anderson (YSU's President, and the ultimate decisionmaker) all conducted independent reviews of Li's tenure application and had reservations about her scholastic productivity despite the amount of leave time afforded to Li to accomplish her research. This satisfies YSU's burden of articulating a legitimate non-discriminatory reason for denying tenure.

*Li*, 164 F. Supp. 3d at 1020. The court also determined that Li had not created a genuine issue of material fact as to pretext, as she did not "argue that YSU's decision to deny tenure—her failure [to produce] scholarship worthy of tenure—had no basis in fact, did not actually motivate YSU's action, or was insufficient to motivate YSU's action." *Id.* The court accordingly concluded that her claim of discrimination based on circumstantial evidence could not survive summary judgment. *Id.* at 1021.

Under a cat's paw theory of liability, Li had contended that the email Jiang forwarded to her evinced Jiang's discriminatory animus, and that that animus had motivated Jiang's decision to recommend against granting Li tenure. That recommendation, Li argued, was then "rubber-stamped" by each of her superiors up the chain of responsibility, so that Jiang's discriminatory animus could be effectively imputed to Anderson's ultimate decision to deny tenure. But the district court concluded that Li had failed to create a genuine issue of material fact as to this theory as well, given that Jiang had invited Li to stay with her during Li's campus visit, had recommended Li's hire, and had made clear her concerns about Li's "insufficient scholastic record" well before Li applied for tenure or their encounter over the forwarded email. *Id.* at 1021. The district court therefore saw the "[c]onsistency on this point" as "further undercut[ting] any inference of discrimination surrounding the email and conversation," leading it to determine that "[t]he totality of Jiang's relationship with Li [] undermines any inference of discriminatory animus." *Id.* The court noted, moreover, that even assuming discriminatory animus, Li had failed to show that Jiang had proximately caused the denial of tenure. Reasoning that under *Staub v. Proctor Hospital*, 562 U.S. 411 (2011), an independent investigation by a decision-maker can "break[] the causal chain" in the context of a cat's paw theory of liability, the court found that the YSU tenure-review procedure ensured that "five different levels of review independently examined Li's case for tenure, and found denial warranted," thus breaking the causal chain. *Li*, 164 F. Supp. 3d at 1021. Whether under the element of discriminatory animus or proximate causation, then, the court concluded that Li's claim of discrimination under a cat's paw theory of liability also could not survive summary judgment. *Id.*

The district court likewise determined that Li had failed to create a genuine issue of material fact as to her First Amendment retaliation claim. Li contended that she could make out

a prima facie case of retaliation under the burden-shifting framework set out in *Dye v. Office of the Racing Commission*, 702 F.3d 286 (6th Cir. 2012),[1] because she had "engaged in protected conduct by declining to speak; specifically, by refusing to forward the email relating to the Shanghai protests," and because the "decision to recommend against tenure would chill future speech, especially when . . . Jiang's recommendation would just be rubber stamped up the tenure review chain of command." *Li*, 164 F. Supp. 3d at 1022-23 (internal quotation marks and citation omitted). The district court found, however, that even if Li had articulated a plausible prima facie case, the uncontested evidence still showed that Jiang and her superiors would have made the same decision they did anyway:

> It is undisputed that, following Li's pre-tenure review in early 2012, only one professor spoke positively of her presentation, compared to three expressing the need for Li to improve her scholarship. These mixed reviews prompted Jiang to inquire into whether she could warn Li not to apply for tenure in the fall. Jiang could not do so, however, because the CBA forbade express comments on when a professor should apply for tenure. Instead, Jiang and Furnish both suggested that Li increase her scholastic output and present at national conferences. Li also recalled that Jiang conveyed to her that, even though Li had to decide when to apply, the dean suggested waiting a year. Notwithstanding these indications, Li applied for tenure that fall without taking any steps to improve her case for tenure, such as publishing articles or presenting at national conferences. All of these actions pre-dated the email and alleged conversation between Li and Jiang. Li has presented no evidence to cast doubt on the sincerity of Defendants' reservations that existed prior to Li applying for tenure.

*Id.* at 1023 (citations omitted).

The district court accordingly granted summary judgment on Li's Title VII claim and her First Amendment retaliation claim under § 1983, and Li now appeals.

---

[1] That framework requires a plaintiff to demonstrate that "(1) she engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against her that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) the adverse action was motivated at least in part by his protected conduct." *Li*, 164 F. Supp. 3d at 1022 (citing *Dye*, 702 F.3d at 294 ).

Li's claim of discrimination hinges on her theory that Jiang recommended against granting tenure on account of Jiang's "anti-Chinese" animus, allegedly revealed after Li refused to forward Jiang's email about the Shanghai protests, and that that recommendation was simply "rubber stamped" up the chain of command to President Anderson, who finally rejected her tenure bid. No other basis for anti-Chinese discrimination is even suggested. Under such a "cat's paw" theory of liability, an employer—here YSU—may be liable under Title VII where "a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and . . . that act is a proximate cause of the ultimate employment action." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 351 (6th Cir. 2012) (italics omitted) (quoting *Staub*, 562 U.S. at 422).

Li's showing of discriminatory animus based on national origin is slim at best, especially given that Jiang, also of Chinese origin, recommended that YSU hire Li in the first place. In any event, even very generously assuming that Li could establish discriminatory animus, she has not shown that Jiang proximately caused the tenure denial, in light of the several layers of independent review her tenure bid passed through. As the *Staub* Court explained,

> if the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . then the employer will not be liable. But the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified.

562 U.S. at 421. At each of three subsequent stages YSU personnel had the opportunity to review the denial of tenure: when President Anderson first considered and denied Li's bid based on her own review of Li's tenure dossier, and during Li's subsequent appeal of Anderson's decision, first to a separate review committee and then, after that appeal failed, to Anderson herself. At each of these levels YSU personnel weighed the merits of Li's tenure case

independently of the allegedly discriminatory recommendation made by Jiang, and each time those independent reviewers concluded that Li did not deserve tenure. Under *Staub*, those separate determinations are enough to stave off any inference of proximate causation here. *See* 562 U.S. at 421. Moreover, although Li points to the testimony of a single professor in her department who asserted that each rung of the review simply signed off on the decision below, and another who expressed disbelief at the denial of tenure, neither of these clearly addresses the decision to reaffirm the denial by the independent appellate board, whose members considered the merits of Li's tenure case beyond Jiang's allegedly biased recommendation. Even if we view the "personal judgment[s]" of these faculty members in the light most favorable to Li—as we must, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986)—they nevertheless do not throw into doubt the totality of the record favoring summary judgment here, as required for Li's claim to survive Jiang's motion for summary judgment, see *Guarino v. Brookfield Tp. Trustees*, 980 F.2d 399, 403 (6th Cir. 1992).

Li also contends that Jiang's negative recommendation and the subsequent denial of tenure amounted to retaliation against her, in violation of her First Amendment right to free speech, including the right not to speak, as protected here by § 1983. In order to survive a motion for summary judgment on such a retaliation claim, Li must first establish a prima facie case (1) that she engaged in speech or conduct that was constitutionally protected; (2) that Jiang and YSU carried out an adverse action against her "that would deter a person of ordinary firmness" from engaging in that protected conduct; and (3) that the preceding two elements are causally linked, that is, that that adverse action was at least partially motivated by Li's protected speech or conduct. *See Dye*, 702 F.3d at 294. Li asserts that she has established that prima facie case here because her decision not to forward Jiang's email was a part of her constitutionally

protected right not to speak, and because after Li refused to forward Jiang's email, Jiang subjected Li to the "adverse employment action" of recommending against tenure, ratified later by YSU. But even assuming that this amounts to a proper prima facie case, in order to prevail on summary judgment Jiang and YSU need only "demonstrate by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Dye*, 702 F.3d at 294 (internal quotation marks and citation omitted). Because their concerns about Li's tenure bid came well before the alleged eruption over Jiang's email, because they had considerable evidence backing them, and because they outlined a compelling case for denying Li tenure, Jiang and YSU have satisfied their burden. As no reasonable juror would fail to deliver a verdict in Jiang and YSU's favor, summary judgment was warranted on this claim, too. *Id.* at 294-95.

Jiang and YSU have carried their burden under *Dye* because the record clearly shows that they had expressed serious reservations about Li's readiness for tenure consideration well before the alleged quarrel over Jiang's email. During Li's pre-tenure review, in the year leading up to Li's application for tenure in Fall 2012, Jiang and Dean Furnish, as well as three tenured faculty members in the department, all made clear that Li's record of publications and presentations at national conferences fell short of what they would have expected of a candidate for tenure, especially given the "unprecedented" amount of leave Li had received while on her two year-long research grants. Although neither Jiang nor Furnish could advise Li to defer her bid for tenure given the strictures of the CBA, both nevertheless made clear to Li before she went up for tenure that they "expect[ed] to see more publications out of [Li's] scholarly work and conference presentations at the national level." What is more, Jiang apparently informed Li sometime before she applied for tenure that Furnish had recommended that Li wait another year,

for these very reasons. Even though Li can point to a lone remark from Dean Furnish allegedly suggesting she would "be good" for a tenure bid that fall, there is no dispute that, at the time of Li's application, her only two publications drew on research she conducted before arriving at YSU and were only fourth-authorships at that, and that she had failed to deliver presentations at any national conferences, as she herself proposed to do under the timelines for each of her research grants. Given what appear to be Jiang and YSU's sincere and longstanding concerns about these deficits in Li's scholarly record, as well as about Li's apparent disengagement from the YSU department (compounded no doubt by her "excessive outside employment" at Ferris State), there is ample evidence suggesting that Jiang and the other YSU administrators would likelier than not have made the same decision against granting tenure even if the email incident had not intervened. With the evidence thus overwhelmingly pointing to Li's scholarly and professional record as the reason for her denial of tenure, irrespective of Jiang's email and the conversation that allegedly ensued, summary judgment was appropriate on this claim.

The judgment of the district court is affirmed.