**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0049n.06

No. 15-3326

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jan 26, 2016
DEBORAH S. HUNT, Clerk

TRACY THOMPSON,                                      )
                                                     )
      **Plaintiff-Appellant,**                       )     ON APPEAL FROM THE
                                                     )     UNITED STATES DISTRICT
v.                                                   )     COURT FOR THE SOUTHERN
                                                     )     DISTRICT OF OHIO
THE OHIO STATE UNIVERSITY et al.,                    )
                                                     )
      **Defendants-Appellees.**                     )     **OPINION**
                                                     )

Before: SILER, MOORE, and GIBBONS, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** Plaintiff-Appellant Tracy Thompson appeals from the district court's order granting summary judgment in favor of Defendants-Appellees Dr. Sharon Schweikhart, Dr. Ann Salimbene, and The Ohio State University ("OSU"). Thompson's claims arise out of her two suspensions from OSU. Thompson contends that Schweikhart referred her to a misconduct board for plagiarism on the basis of her race, in violation of 42 U.S.C. § 1983; that OSU was deliberately indifferent in investigating Thompson's subsequent complaint against Schweikhart, in violation of Title VI of the Civil Rights Act of 1964; and that Salimbene retaliated against Thompson by referring her for a second suspension, in violation of § 1983. The district court granted summary judgment on each of Thompson's claims. For the reasons discussed below, we **AFFIRM** the judgment of the district court.

### I. FACTS AND PROCEDURAL HISTORY

Thompson is an African American who was a graduate student in OSU's Masters in Health Administration ("MHA") program. R. 91-3 (Thompson Decl. at 1) (Page ID #2031). Thompson was the only African-American student enrolled in the program, out of approximately thirty students. *Id.* Thompson entered the two-year program in the fall of 2009 and was expected to graduate in the spring of 2011. *Id.* Because Thompson was placed on academic suspension on two separate occasions, however, she did not graduate until 2013. R. 70 (Thompson Dep. at 23) (Page ID #527). Thompson's three claims arise out of these suspensions.

**A. Thompson's First Suspension for Plagiarism in Schweikhart's Information Systems Course**

Thompson's first suspension occurred in an Information Systems course taught by Schweikhart in the fall of 2010. R. 71 (Schweikhart Dep. at 90) (Page ID #897). Schweikhart is Caucasian and is the director of the MHA program. R. 84 (Schweikhart Aff. at 1) (Page ID #1561). Schweikhart and Thompson had several interactions prior to Thompson enrolling in Schweikhart's course.

Schweikhart first communicated with Thompson in 2008 after Thompson's first application to OSU was denied. R. 70-1 (Thompson Dep. Ex. D at 1) (Page ID #678); R. 71 (Schweikhart Dep. at 60–66) (Page ID #889–91). After Thompson spoke with Schweikhart about how to improve her application, Thompson reapplied. Although Thompson did not meet the minimum GPA for admission, Schweikhart sent a letter to the Associate Dean requesting that Thompson be admitted. R. 84-1 (Schweikhart Aff. Ex. 1) (Page ID #1563).

2

After enrolling in the MHA program, Thompson took an Operations Management course taught by Schweikhart in the winter of 2010. R. 91-3 (Thompson Decl. at 1) (Page ID #2031); R. 71 (Schweikhart Dep. at 68) (Page ID #891). According to Thompson, she "began to feel during that course that Dr. Schweikhart was singling [her] out for mistreatment." R. 91-3 (Thompson Decl. at 2) (Page ID #2032). Thompson failed the mid-term for the class. *Id.* Thompson states that when she went to Schweikhart to discuss how her performance could improve, Schweikhart "responded by rather rudely telling" Thompson that she should "'figure it out.'" *Id*. Schweikhart does not recall this. R. 71 (Schweikhart Dep. at 168) (Page ID #916). Thompson also claims that classmates told her that Schweikhart "hates [her] guts" and treats Thompson inappropriately. *See, e.g.*, R. 70 (Thompson Dep. at 193) (Page ID #570). Thompson's final grade in the Operations Management course was a "B." R. 69-1 (OSU Resp. to Interrog. at 12) (Page ID #506). Schweikhart did not give lower than a "B" grade that term. *Id.*

Schweikhart prepared two letters of recommendation for Thompson in 2010. R. 70 (Thompson Dep. at 196–99) (Page ID #570–71); *see* R. 70-3 (Dep. Exs. V & W) (Page ID #849–50). According to Thompson, she asked Schweikhart for a letter "because it was required that the chair of the department provide a letter of recommendation" for the fellowship for which Thompson was applying. R. 70 (Thompson Dep. at 197) (Page ID #571). Thompson believes that Schweikhart chose to write the letter because she knew "it would look strange" if the department chair refused. *Id.* During the year, Schweikhart also participated in selecting

Thompson to represent OSU's MHA program in a national case competition, a "highly thought of, coveted, and well-respected" recognition. R. 84 (Schweikhart Aff. at 1) (Page ID #1561).

Thompson enrolled in Schweikhart's Information Systems course in the autumn quarter of 2010. R. 70-3 (Thompson Dep. Ex. HH) (Page ID #874). In grading a short paper assigned in the class, Schweikhart became concerned with Thompson's paper. R. 71 (Schweikhart Dep. at 106) (Page ID #901). According to Schweikhart, the language did not "sound like the words of a student." *Id*. Because Schweikhart had given this assignment in the past, and graded 25 to 30 papers each time, Thompson's paper "stood out" to her. *Id.* at 107 (Page ID #901). Schweikhart entered sentences from Thompson's paper into Google. *Id.* This search produced a short internet article, and Schweikhart discovered that "the first three sentences" were in the first paragraph of Thompson's paper without quotes. *Id.* at 108 (Page ID #901). The sentences included a citation to a different article and the article from which the sentences were taken "wasn't in the citations at all." *Id.* Schweikhart claims that she Googled other sentences and found "word-for-word sentences throughout the paper, covering the vast majority of the paper." *Id.*

Schweikhart reported Thompson's paper to OSU's Committee on Academic Misconduct (COAM). *Id.* at 121–24 (Page ID #905). Schweikhart's report included the following:

> PLEASE NOTE: I am sending [this] to COAM because the situation surrounding this paper and this students [sic] situation is somewhat troubling. The student has performed well and appropriately in previous courses . . . . Further, the student has had a difficult and stressful quarter, with her mother being very ill and a job search in progress. I do not believe the student should be suspended, as it would delay graduation by a full year if the student cannot take courses in winter or spring quarter.

R. 71-1 (Pl. Dep. Ex. 20 at 5) (Page ID #963).

Thompson denied any plagiarism. *See* R. 70-3 (Dep. Ex. M at 1) (Page ID #830). Thompson argued to COAM that "limited instructions" were given for the assignment and so she "defaulted to the standard pattern and practice for this class" and "cited in the manner consistent with citations that were previously acceptable, and consistent with citations used by the rest of the class." *Id.* at 2 (Page ID #831).[1] Thompson stated that other students told her that they used the same citation style and that it was "common practice in the . . . program as a whole." R. 70 (Thompson Dep. at 112) (Page ID #549). Thompson does not have copies of any papers from other students. *Id.*

The COAM panel found that Thompson violated OSU's Code of Student Conduct. R. 70-3 (Dep. Ex. N at 1) (Page ID #838). Thompson was suspended for the Spring and Summer quarters of 2011 and was given a failing grade in the Information Systems course. *Id.* Timothy Curry, the Director of COAM, sent Thompson the terms of her suspension. *Id.* at 2 (Page ID #839). According to OSU's Code of Student Conduct, as a suspended student, Thompson was "denied all privileges afforded a student" and was prohibited from entering university property without "express written permission from the vice president for student affairs." *Id.* at 1 (Page ID #838). In order to seek permission to enter campus, a suspended student "must file a written

---

[1]Thompson acknowledges that she did not include quotation marks around some "word-for-word direct transfers of material." R. 70 (Thompson Dep. at 94) (Page ID #545). However, Thompson claims that each concept in the paper included a citation, although some did not cite to the right source on accident. R. 70-3 (Dep. Ex. M. at 3-4) (Page ID #832-33). According to Thompson, in editing and rearranging the paper, she "deleted the wrong citation for the first section." *Id*. at 3 (Page ID #832).

petition to the vice president for student affairs for entrance to the campus for a limited, specified purpose or to have the terms of his condition modified or reduced." *Id.*

Thompson appealed the COAM decision, arguing that her suspension should be reduced. R. 70-3 (Dep. Ex. O at 1) (Page ID #840). Her appeal was denied by OSU's Executive Vice President and Provost in February 2011. R. 70-3 (Dep. Ex. P) (Page ID #843).

**B. Thompson's Report of Racial Discrimination to OSU and OSU's Investigation**

In March 2011, Thompson complained to OSU's Office of Human Resources ("OHR") that Schweikhart discriminated against her because of her race. R. 78-1 (Pl. Dep. Ex. 4 at 1) (Page ID #1431). Thompson primarily alleged that Schweikhart was discriminatory in (1) giving her a failing grade on her mid-term and telling her to "'figure out' why she received" that grade, (2) not approving Thompson's paper topic although Schweikhart approved the topic of others, (3) singling Thompson out for criticism in a group presentation, and (4) referring her to COAM because of her race. *See id.*

Bryan Lenzo, an "[e]mployee and labor relations consultant" in OHR, was assigned to investigate Thompson's complaint. R. 78 (Lenzo Dep. at 16) (Page ID #1381). Lenzo's "primary role" in OHR "was to investigate complaints of employment discrimination," rather than student complaints. *Id.* at 38 (Page ID #1387). Thompson's complaint was the only student complaint of discrimination that Lenzo investigated. *Id.* at 39 (Page ID #1387).

Lenzo's interview with Schweikhart revealed that Schweikhart "has referred two other students to the academic misconduct process since her tenure with the university began in 1990," both of whom "were also African American." R. 78-1 (Pl. Dep. Ex. 4 at 4) (Page ID #1434).

6

Schweikhart explained to Lenzo that it was a "'sad coincidence'" and that she "applies academic standards evenly to all students." *Id.* The first student that Schweikhart referred to COAM was accused by another student of "looking at notes during an examination." R. 69-1 (OSU Resp. to Interrog. at 8) (Page ID #502). Because Schweikhart believed that some answers on the student's test "were exact copies of passages from the course textbook," Schweikhart referred the student to COAM. *Id.* COAM found that the student had not committed academic misconduct because "the student could have memorized passages from the text." *Id.* Schweikhart referred the second student to COAM after reading the student's paper and believing that it did not sound like student work. *Id.* Schweikhart found "that two uncited sources accounted for over half the text in the student's paper." *Id.* COAM found the student guilty of plagiarism. *Id.*

Lenzo also attempted to get in contact with five witnesses that Thompson provided. R. 78-1 (Pl. Dep. Ex. 4 at 2) (Page ID #1432). Two were unresponsive to his phone calls. *Id.* "Witness 1" "stated they never remembered telling Ms. Thompson that Dr. Schweikhart discriminated against or disliked her," and that "they never witnessed Dr. Schweikhart treat minorities in the class differently or poorly." *Id.* at 5 (Page ID #1435). "Witness 2, who self-identified . . . as a minority, . . . stated they did not witness any" interactions between Thompson and Schweikhart and had "never witnessed Dr. Schweikhart treat minorities poorly." *Id.* "Witness 3," who also "self-identified . . . as a minority, stated that they have witnessed Dr. Schweikhart come down harder on Ms. Thompson, but they didn't know if it was motivated by her race." *Id.* at 5–6 (Page ID #1435–36). Witness 3 did "not believe Dr. Schweikhart treats

7

minority students poorly, but she was harder on Ms. Thompson" and that they "sensed a tension" between Thompson and Schweikhart. *Id.* at 6 (Page ID #1436).

Lenzo's report concluded that there was "insufficient evidence to substantiate" Thompson's claims of discrimination. *Id.* at 6 (Page ID #1436). The conclusion provided that there was "no evidence or witness testimony to support that Ms. Thompson was treated differently than any similarly situated comparatives." *Id.* Moreover, Lenzo noted that Thompson "received above average grades in both of her previous classes with Dr. Schweikhart" and that Schweikhart wrote Thompson letters of recommendation "that highly praised her work and accomplishments." *Id.* Lenzo also noted that witnesses "unanimously stated they did not believe Dr. Schweikhart treated minorities poorly or differently" or that Schweikhart treated Thompson differently because of her race. *Id.* Finally, Lenzo noted that Schweikhart's referral of three African American students "over a 30-year time frame does not constitute, by itself, positive evidence of racial discrimination." *Id.*

After Lenzo issued his report, Thompson emailed Lenzo to address errors in the case report. R. 78-1 (Pl. Dep. Ex. 7) (Page ID #1449). Thompson noted that although the report indicated that she had "taken 3 classes from Dr. Schweikhart and received good grades," Thompson had taken only one class from Schweikhart prior to the Information Systems course, and she received a B in that course. *Id.* Thompson also told Lenzo that the letter of recommendation written by Schweikhart "was required to be written by the director" of the department. *Id.* Lenzo responded that he would attach Thompson's information to the investigation file. *Id.*

Lenzo's report was approved by his supervisor, Olga Esquivel-Gonzalez. R. 79 (Esquivel-Gonzalez Dep. at 67) (Page ID #1468). After Thompson's mother complained to several members of OSU administration about Thompson's situation, *see* R. 79-1 (Pl. Dep. Ex. 27 at 6) (Page ID #1527), Esquivel-Gonzalez compiled a summary of HR's investigation and e-mailed it to other OSU administrators. *Id.* at 7 (Page ID #1528). Esquivel-Gonzalez's e-mail states that "[i]n determining whether Professor Schweikhart exhibited a discriminatory animus toward Tracy, we examined the allegations, witness statements[,] and Tracy's experience, via grades, in 2 prior courses. We found that in these 2 prior courses with Professor Schweikhart, Tracy received very good grades." *Id.* The e-mail also discussed the lack of corroboration from witnesses and Schweikhart's letters of recommendation for Thompson. *Id.* It does not mention Thompson's corrections. *Id.*; *see* R. 79 (Esquivel-Gonzalez Dep. at 216–220) (Page ID #1505–06).

**C. Thompson's Second Suspension for Violating the Terms of Her First Suspension**

Thompson returned to OSU following her suspension in August 2011. Soon thereafter, in November 2011, Thompson was notified by Andrea Goldblum, the Director of Student Conduct, that she had been accused of "Dishonest Conduct" and "Failure to comply" with the sanctions imposed against her for her first suspension. R. 70-3 (Dep. Ex. AA) (Page ID #861). These accusations arose out of Thompson's attempt to complete the second half of a six-credit course while she was suspended.

Thompson was cross-enrolled in a "Six-Sigma course" at OSU's business school. R. 91-3 (Thompson Decl. at 4) (Page ID #2034). The course was six credits, and thus continued into

the "first half of the spring quarter" in which Thompson was suspended. *Id.* at 4 (Page ID #2034). Thompson states that, pursuant to OSU's Code of Student Conduct, she met with the Vice President for Student Affairs, Dr. Javaune Adams-Gaston, in order to have the terms of her suspension modified so that she could finish the course. *Id.* Thompson claims that Adams-Gaston gave her permission to complete the course, provided that her business school instructor agreed. R. 70 (Thompson Dep. at 164) (Page ID #562).

Thompson states that she spoke with the instructor, Doug Evans, who granted her permission. R. 91-3 (Thompson Decl. at 5) (Page ID #2035). In order to reduce the number of times that Thompson needed to ask permission to enter campus, Evans met with Thompson off campus. R. 73-1 (Pl. Dep. Ex. 1 at 10) (Page ID #1082). Thompson needed to enter campus during the spring quarter, however, to take a standardized test and give her final presentation. *Id.* at 12 (Page ID #1084–90). On three occasions, Thompson emailed Adams-Gaston to seek permission. *Id.* The subject of these emails read "Permission to enter OSU Property" and each included the date, time, location, instructor, and "purpose" of her request. *Id.* The last of these emails, sent in May 2011, requested permission to enter for "Final presentation for the 15 week six sigma projects course lasting all of Winter and half of Spring quarters." *Id.* at 18 (Page ID #1090). Adams-Gaston approved each of these requests.

Because Thompson was suspended for the spring quarter of 2011, Evans could not give her a final grade for the six-sigma course. Thompson thus enrolled in the six-sigma course offered in the fall of 2011, which was offered by a different instructor, Terry Klinker. R. 80 (Klinker Aff. at 1) (Page ID #1532). Evans told Klinker that, "[d]ue to circumstances beyond

10

anyone's control, [he] was unable to give [Thompson] a grade for her work during the Winter/Spring Quarter," and he requested that Klinker give Thompson an "A." R. 73-1 (Adams-Gaston Dep. Ex. 1 at 22) (Page ID #1094). Thompson also spoke with Klinker. R. 80 (Klinker Aff. at 1) (Page ID #1532).

Business school staff contacted Dr. Ann Salimbene, the Assistant Dean of the Graduate School, to ask how to handle the situation. R. 72 (Salimbene Dep. at 46–49) (Page ID #981–82). Salimbene spoke with Evans and Klinker. *Id.* at 51–52 (Page ID #982). According to Salimbene, after contact with both Goldblum and Curry, Goldblum asked Salimbene to put a complaint in writing and present the situation to the Office of Student Conduct. *Id.* at 63–64 (Page ID #985); R. 75 (Goldblum Dep. at 86) (Page ID #1229); *see* R. 73-1 (Pl. Dep. Ex. 1 at 2–3) (Page ID #1074–75). Goldblum conducted the investigation into the complaint against Thompson. R. 75 (Goldblum Dep. at 89) (Page ID #1230).

At Thompson's Conduct Board hearing, Salimbene gave an opening and closing statement, answered questions, and asked questions of Thompson. R. 70 (Thompson Dep. at 242) (Page ID #582); R. 77 (Piazza Dep. at 60–61) (Page ID #1365–66). A student member of the conduct board, who has served on approximately ten disciplinary panels, believes that this was unusual. R. 77 (Piazza Dep. at 60–61) (Page ID #1365–66). Adams-Gaston provided a written statement to the panel. R. 75 (Goldblum Dep. at 110) (Page ID #1235). According to Adams-Gaston, she understood Thompson's email as seeking permission to "enter the campus to meet with a faculty member," not to "complete a course." R. 73-1 (Pl. Dep. Ex. 1 at 28) (Page ID #1100). A five-member panel found that Thompson had not committed "Dishonest conduct,"

but that she had violated the terms of her suspension. R. 77 (Piazza Dep. at 22) (Page ID #1356). Salimbene was not present during the panel's deliberations. *Id.* at 61 (Page ID #1366). The panel imposed a two-quarter suspension on Thompson. R. 70-3 (Dep. Ex. EE) (Page ID #867).

Thompson retook Information Systems with Schweikhart and earned an "A." R. 70 (Thompson Dep. at 258) (Page ID #586). Thompson also took the capstone MHA course with Schweikhart and received an "A." *Id.* at 259 (Page ID #586). Thompson graduated in 2013. *Id.* at 23 (Page ID #527).

## D. Procedural History

Thompson filed a complaint on November 26, 2012, in the U.S. District Court for the Southern District of Ohio against OSU, Schweikhart, and Salimbene. R. 1 (Compl. at 1) (Page ID #1). Thompson's amended complaint alleged violations of 42 U.S.C. § 1983 for First Amendment retaliation, substantive due process, and race discrimination. R. 23 (Am. Compl. at 1–2) (Page ID #87–88). Thompson also alleged that OSU violated Title VI. *Id.* The district court dismissed the substantive due process claim. R. 40 (01/06/14 Dist. Ct. Op. at 1) (Page ID #194). After discovery, the defendants moved for summary judgment, R. 69 (Def. Mot. for Summ. J.) (Page ID #432), and Thompson filed a memorandum in opposition, R. 92 (Pl. Opp'n to Summ. J.) (Page ID #3513).

Thompson produced an affidavit from a statistician, Dr. Zaven Karian, purporting to analyze the likelihood that Schweikhart would have referred only African-American students for academic misconduct in her twenty years at OSU. R. 91-4 (Karian Decl. at 1) (Page ID #2037). Karian's report states that "in the absence of race discrimination," the chance that Schweikhart

would have done so is "very likely somewhere between 1 in 10,000 and 3 in 1,000," depending on the exact number of African-American students in each class (a number that OSU could only approximate). *Id.* at 2 (Page ID #2038). In her opposition to summary judgment, Thompson primarily argued that this statistical evidence alone could raise a genuine issue of fact that Schweikhart's referral to COAM was racially discriminatory. R. 92 (Pl. Opp'n to Summ. J at 24) (Page ID #3536).

On February 20, 2015, the district court granted summary judgment in favor of OSU, Schweikhart, and Salimbene on each of Thompson's claims. *Thompson v. Ohio State Univ.*, 92 F. Supp. 3d 719, 723 (S.D. Ohio 2015). Thompson appealed on March 20, 2015. R. 101 (Notice of Appeal) (Page ID #3651).

## II. DISCUSSION

### A. Standard of Review

"We review de novo a district court's grant of summary judgment." *Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment "is appropriate only if, in viewing the evidence in the light most favorable to the nonmoving party, reasonable minds could come to but one conclusion, in favor of the moving party." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008) (internal quotation marks omitted).

13

**B. Section 1983 Equal Protection Claim Against Schweikhart**

Thompson first argues that Schweikhart violated 42 U.S.C. § 1983 by referring her to COAM. Appellant Br. at 26. "To state a claim under § 1983, a plaintiff must plead and prove that she has been deprived of a right secured by the Constitution or federal laws, by one acting under color of state law." *Weberg v. Franks*, 229 F.3d 514, 522 (6th Cir. 2000). Here, Thompson claims that Schweikhart referred her to COAM on the basis of her race, and thus violated the Fourteenth Amendment's Equal Protection Clause. An Equal Protection claim under § 1983 requires discriminatory intent. *Id.*; *see also Washington v. Davis*, 426 U.S. 229, 239–42 (1976).

In granting summary judgment, the district court applied the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973), to evaluate Thompson's § 1983 Equal Protection claim. *See Thompson*, 92 F. Supp. 3d at 730. The district court noted that "the parties d[id] not cite any caselaw in which a court applied the *McDonnell Douglas* burden-shifting framework in a § 1983 Equal Protection claim," but the district court assumed that the *McDonnell Douglas* framework was appropriate because "[t]he parties agree[d]" that it applied. *Id.* Under *McDonnell Douglas*, Thompson must first establish a prima facie case of discrimination. *Serrano v. Cintas Corp.*, 699 F.3d 884, 892 (6th Cir. 2012). Traditionally, this prima facie case consists of four prongs: (1) that the plaintiff "is a member of a protected class"; (2) that she was "qualified for [the] job"; (3) that she "suffered an adverse employment decision"; and (4) that she was "treated differently than similarly situated non-protected" individuals. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). If

Thompson successfully establishes a prima facie case, "the burden shifts to [Schweikhart] to offer evidence of a legitimate, nondiscriminatory reason for" referring Thompson to COAM. *Id.* If Schweikhart does so, "the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination." *Id.* at 391–92.

On appeal, the parties again appear to agree that *McDonnell Douglas*'s burden-shifting framework is appropriate; the parties dispute, however, whether Thompson must use *McDonnell Douglas*'s traditional four-pronged test to establish her prima facie case. *See* Appellant Br. at 26–27. According to Thompson, the traditional prima facie test of *McDonnell Douglas* does not apply because she has offered statistical proof—Dr. Karian's statistical report—that sufficiently raises an inference of discrimination. Appellant Br. at 27. Schweikhart contends that the four-pronged *McDonnell Douglas* test is appropriate and, under this test, Thompson cannot establish a prima facie case because a referral to a student misconduct board is not an "adverse action" and because Thompson cannot point to a similarly situated comparator. Appellee Br. at 45–47. We need not resolve this disagreement. The district court found that Thompson could not establish pretext, and thus it assumed without deciding that Thompson established a prima facie case. *Thompson*, 92 F. Supp. 3d at 730. Because we agree with the district court that Thompson has not rebutted Schweikhart's nondiscriminatory rationale, we also will assume without deciding that Thompson has established a prima facie case through Dr. Karian's statistical report.

Assuming that Thompson has established her prima facie case, the burden shifts to Schweikhart to articulate a legitimate, nondiscriminatory rationale for her referral of Thompson to COAM. *See White*, 533 F.3d at 391. Schweikhart has met this burden. According to

Schweikhart, she recognized that Thompson's paper did not sound like a usual student paper and entered the phrases into Google; this search revealed that Thompson's paper contained plagiarism. *See* R. 69 (Mot. for Summ. J. at 51) (Page ID #482); R. 71 (Schweikhart Dep. at 106–08) (Page ID #901). Thompson herself does not dispute that she failed to include quotation marks around some "word-for-word direct transfers of materials." R. 70 (Thompson Dep. at 94) (Page ID #545). Moreover, as the district court recognized, Schweikhart has nondiscriminatory rationales for each of her referrals to COAM. *See Thompson*, 92 F. Supp. 3d at 731.

Because Schweikhart has articulated a nondiscriminatory reason for referring Thompson to COAM, the burden shifts back to Thompson to demonstrate that this reason is merely a pretext for unlawful discrimination. *See White*, 533 F.3d at 391. Thompson has failed to do so. In arguing that Schweikhart's stated reason is pretextual, Thompson again points to Karian's statistical report. *See* Appellant Br. at 28. According to Thompson, this report establishes that it is highly unlikely that Schweikhart would have referred only African-American students to COAM and no white students, and thus Thompson argues that the statistics alone rebut Schweikhart's nondiscriminatory explanation. *Id.* But Thompson's evidence of statistical disparity cannot demonstrate that race "played a factor in any *particular*" referral to COAM. *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1469 (6th Cir. 1990). Because Schweikhart has offered a nondiscriminatory explanation that "undercut[s] the importance of [Thompson's] statistical proof," Thompson cannot establish pretext by referring again to the statistics alone. *Id.* Accordingly, absent a showing that Schweikhart's "explanations are inherently suspect" or "other direct or circumstantial evidence suggesting that the proffered reasons are not true,"

summary judgment is appropriate in favor of Schweikhart. *Id.*; *see also Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 438 (6th Cir. 2002). Because Thompson points to no other evidence other than Karian's statistical report, Thompson has not met her burden to demonstrate that Schweikhart's stated reason is a pretext for unlawful discrimination, and the district court did not err in granting summary judgment.

## C. Title VI Deliberate Indifference Claim Against OSU

Thompson also argues that OSU "violated Title VI by being deliberately indifferent to the race discrimination against" Thompson and "covering up the discrimination once it had knowledge" that it was occurring. Appellant Br. at 41. Title VI prohibits institutions receiving federal funding from discriminating on the basis of race. 42 U.S.C. § 2000d. According to Thompson, Lenzo's "report was so stunningly inadequate, illogical, and inconsistent that a jury could readily conclude that OSU exhibited deliberate indifference to discrimination" or "attempted to actively conceal discrimination." Appellant Br. at 43. Thompson's evidence, however, does not raise a genuine issue of material fact as to OSU's deliberate indifference.

We have not had the opportunity to consider whether a plaintiff can allege deliberate indifference to racial discrimination or harassment under Title VI. It is well established that a public educational program may be liable for its deliberate indifference to sexual harassment under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, which prohibits discrimination on the basis of sex. *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 653 (1999) (student-on-student sexual harassment); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998) (teacher-on-student sexual harassment). Other circuits have accordingly held

17

that a school can be liable for deliberate indifference to racial harassment under Title VI, noting that Title IX was based on Title VI. *See, e.g.*, *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 665 n.10 (2d Cir. 2012); *Bryant v. Indep. Sch. Dist. No. I-38*, 334 F.3d 928, 934 (10th Cir. 2003). Because we find that Thompson has failed to raise a genuine issue of material fact as to whether OSU was deliberately indifferent in investigating her claim of racial discrimination, we will assume without deciding that deliberate indifference claims are cognizable for racial discrimination under Title VI.

In the context of Title IX, a public educational institution may be liable for teacher-on-student sexual harassment if the school has "actual knowledge" of the harassment and is deliberately indifferent in its response. *Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 366 (6th Cir. 2005) (quoting *Gebser*, 524 U.S. at 290). A school's "deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000) (quoting *Davis*, 526 U.S. at 645). Deliberate indifference to discrimination is shown "only where the [school's] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. A school "need not . . . engage in particular disciplinary action to avoid Title IX liability." *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 446 (6th Cir. 2009) (internal quotation marks omitted). But "[w]here a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail," the school has acted with deliberate indifference. *Id.* (quoting *Vance*, 231 F.3d at 261).

Thompson contends that OSU was deliberately indifferent because of the "irrationality of the investigation" that it conducted into her complaint and OSU's "purported reliance on facts that the investigator knew or should have known to be false." Appellant Br. at 44. Thompson argues that OSU's deliberate indifference is evidenced by Lenzo misstating the number of classes that Thompson took with Schweikhart, mischaracterizing her grade in Schweikhart's class as "above average," misrepresenting the amount of time that Schweikhart taught at OSU, and misrepresenting statements by witnesses. *Id.* at 44–45. Thompson also argues that OSU's selection of Lenzo himself—who primarily worked on employment cases and had never found that OSU was discriminatory towards a student—is evidence of deliberate indifference. *Id.* at 45. Thompson further claims that Esquivel-Gonzalez's response to Thompson's mother, in which Esquivel-Gonzales repeats many of Lenzo's errors, is evidence of her attempting to "conceal facts that she knew suggested race discrimination." *Id.* at 51.

Even with all reasonable inferences drawn in Thompson's favor, Thompson has not established a genuine issue of material fact as to whether OSU was deliberately indifferent in responding to her discrimination complaint. We have found that a plaintiff established genuine issues of material fact as to deliberate indifference in cases in which a school was aware of continuing and severe harassment but responded with measures that the school knew were insufficient to end the harassment. For example, in *Patterson v. Hudson Area Schools*, 551 F.3d at 440, 448–50, we denied summary judgment where a student faced escalating sexual harassment and sexual assault, the student's parents "repeatedly reported several incidents" to the school district, and the school district "knew that its methods were ineffective, but did not

19

change those methods." Further, in *Vance v. Spencer County Public School District*, 231 F.3d at 256–62, we denied a post-trial motion for judgment as a matter of law where a student was repeatedly harassed and assaulted, the student and her parents made continuing complaints to the school, but the school failed to discipline any students or investigate the plaintiff's Title IX complaint.

Thompson's case is far from these fact patterns. Thompson's complaint to OSU alleged that Schweikhart was discriminatory in giving her a failing grade on her mid-term, not approving her paper topic, criticizing her group presentation, and referring her to COAM. *See* R. 78-1 (Pl. Dep. Ex. 4 at 1) (Page ID #1431). In response, OSU appointed an investigator and interviewed witnesses; this investigation demonstrated that Schweikhart had referred three African-American students to COAM and no white students, and that Schweikhart had given Thompson a "B" in a previous course. *Id.* at 4 (Page ID #1434). Only one witness indicated that Schweikhart treated Thompson more "harshly" than other students, but this witness indicated that they did not know whether it was because of race. *Id.* at 6 (Page ID #1436). OSU subsequently compiled a report and concluded from the investigation that there was insufficient evidence of discrimination. *Id.* at 6 (Page ID #1436). Although Thompson raised errors in the report with Lenzo, such as Lenzo's statement that Thompson had taken three classes with Schweikhart, Lenzo responded to Thompson's email and included her email with his report. R. 78-1 (Pl. Dep. Ex. 7) (Page ID #1449). Thompson did not raise any further harassment or discrimination with OSU's HR office, nor did OSU have any other reason to believe that its "efforts to remediate [were] ineffective" or disproportionate. *See Vance*, 231 F.3d at 261. Thompson has not demonstrated a

genuine issue of material fact that OSU's response to her complaint was "*clearly unreasonable in light of the known circumstances.*"   *See Davis*, 526 U.S. at 648 (emphasis added). Accordingly, the district court properly granted summary judgment in favor of OSU on Thompson's claim under Title VI.

**D.  Section 1983 First Amendment Retaliation Claim Against Salimbene**

Lastly, Thompson alleges that Salimbene violated § 1983 by referring her to the Student Conduct Board in retaliation for Thompson's exercise of her First Amendment right to complain of racial discrimination against Schweikhart.  "It is well established that government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right."  *Thaddeus-X v. Blatter*, 175 F.3d 378, 386 (6th Cir. 1999) (en banc).  A prima facie claim of retaliation has three elements:

> (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection . . . that is, the adverse action was motivated at least in part by the plaintiff's protected conduct."  *Id.* at 394.  If the plaintiff makes this showing, the defendant "can avoid liability by showing that [they] would have taken the same action even in the absence of the protected conduct.

*Gaspers v. Ohio Dep't of Youth Servs.*, 648 F.3d 400, 412 (6th Cir. 2011) (internal quotation marks omitted).  "[S]ummary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant."  *Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 294–95 (6th Cir. 2012) (internal quotation marks omitted).

Salimbene acknowledges that Thompson can meet the first prong of her prima facie case because Thompson engaged in constitutionally protected conduct in alleging racial discrimination. R. 69 (Def. Mot. for Summ. J. at 28) (Page ID #459). Thompson can also meet the second prong of her prima facie case because Salimbene conceded in her summary judgment motion that the referral to the conduct board was an adverse action. *Id.* at 30 (Page ID #461).[2] Thompson cannot meet the remaining prong of her prima facie case, however. Thompson has not offered sufficient evidence of causation to survive a motion for summary judgment. "To demonstrate [a] causal connection, a plaintiff is required to proffer evidence sufficient to raise the inference that his or her protected activity was a motivating factor for the adverse decision." *Arnett v. Myers*, 281 F.3d 552, 560 (6th Cir. 2002). This inference may be supported by "[c]ircumstantial evidence, like the timing of events or the disparate treatment of similar individuals." *Id.* at 560–61.

Here, Thompson argues that a fact question exists because "Thompson testified that she engaged in protected speech in Dr. Salimbene's presence." Reply Br. at 24. In her declaration, Thompson stated that "[p]rior to the start" of her COAM hearing, she "made clear [her] concerns that Dr. Schweikhart's accusations against [her] were racially discriminatory, and Dr. Salimbene was present." R. 91-3 (Thompson Decl. at 3) (Page ID #2033). Thompson does not point to any evidence in the record indicating that Salimbene acted on this knowledge by disciplining

---

[2]The parties dispute whether Salimbene's subsequent conduct in Thompson's hearing, such as presenting an opening statement and asking questions, constitutes an "adverse action." *See* Appellant Br. at 58–59. But even on the assumption that this conduct is sufficiently "adverse," Thompson cannot establish causation for these actions for the same reason that she has failed to establish causation for Salimbene's referral to the conduct board.

Thompson in part due to Thompson's protected conduct; rather, Thompson suggests that she need not point to additional evidence because OSU's sole argument in its motion for summary judgment was that Salimbene did not know of Thompson's complaint. Reply Br. at 23. But it is Thompson's burden to "produce enough evidence of a retaliatory motive such that a reasonable juror could conclude" that Salimbene would not have taken adverse action against her "but for [Thompson's] engagement in protected activity." *Dye*, 702 F.3d at 305. Thompson does not argue that the timing of the events suggests that Salimbene retaliated, nor does she raise any other direct or circumstantial evidence from which a causal connection can be inferred.[3] Accordingly, Thompson has failed to establish a causal connection between Salimbene's action and Thompson's protected activity, and Salimbene is entitled to summary judgment.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment.

---

[3]Thompson did testify that she believes that Salimbene and Schweikhart were "close friends" and that she has seen them have lunch together. R. 70 (Thompson Dep. at 260) (Page ID #586). But, as Thompson herself explained in her reply brief, she "raised the fact that she had repeatedly seen Salimbene and Schweikhart having lunch together, not to 'establish causation,' but primarily because Salimbene claimed that the two never had lunch together." Reply Br. at 24.